### No. 2333
### Second Circuit Appeal

---

**THOMAS M. MILLION v. W. K. HENDERSON IRON WORKS AND SUPPLY COMPANY**

---

(June 23, 1925, Opinion and Decree)
(July 11, 1925, Rehearing Refused)

---

(*Syllabus by the Editor.*)

1. Louisiana Digest—Master and Servant— Par. 159, 159 (a).
Where the evidence clearly shows that the injured employee suing under Section 8, Subsection 1 (b) of the Workmen's Compensation Act No. 20 of 1914, is permanently, totally disabled to do work of any reasonable character, he is entitled to compensation for the period of his disability not to exceed 400 weeks.

2. Louisiana Digest—Master and Servant— Par. 160 (I); Appeal—Par. 512.
Where eminent physicians testify as to the disability of an injured employee suing under the Workmen's Compensation Act No. 20 of 1914, disagree in their diagnosis as the cause and probable duration of plaintiff's condition, damages will not be allowed as for a frivolous appeal.

Appeal from First Judicial District Court of Louisiana, Parish of Caddo, Hon. T. F. Bell, Judge.

This is a suit brought by an injured employee for compensation suing under the Workmen's Compensation Act No. 20 of 1914.

There was judgment for plaintiff and defendant appealed. Judgment affirmed.

Long & Crow, of Shreveport, attorneys for plaintiff, and appellee.

J. S. Atkinson, Alex F. Smith, of Shreveport, attorneys for defendant, appellant.

### STATEMENT OF CASE

REYNOLDS, J. Thomas M. Million sues W. K. Henderson Iron Works and Supply Company for compensation under the Workmen's Compensation Act at the rate of $20 a week during his disability, not exceeding 400 weeks, for injuries alleged to have been sustained by him in an accident on August 29, 1924, arising out of and in the course of his employment by defendant. He alleges that:

"While lifting heavy iron machinery used in connection with the lathe with which he was working, when his back and the muscles, ligaments, cords, nerves and tissues of the said back and in, near and about the same, were broken, strained, deranged, impaired and seriously affected, and, in addition thereto, there was a loosening near the sacro iliac joint, a tilting of some of the lumbar vertebrae; that, in addition thereto, the spinal cord, nerve cen-

ter and nerve supplies were involved and impaired, and by reason thereof petitioner was thereby wholly and totally disabled and is incapacitated to do or perform any kind of labor of a reasonable character."

He further alleges that at the time of the injury he was earning $43.20 a week.

He alleges that defendant had paid him compensation for seven weeks but had refused to make further payments.

He attached to his petition a contract between himself and his attorney whereby the latter is to receive one-third of whatever may be recovered in this action for his fees in the premises.

Defendant answered, admitting the employment, and that plaintiff's weekly wage was $43.20, but denied that he was injured in the manner or to the extent alleged by him.

On these issues the case went to trial and there was judgment in favor of the plaintiff and against the defendant for compensation at the rate of $20 per week during plaintiff's disability, not to exceed 400 weeks, with legal interst on each payment from its maturity until paid, the first payment to be due August 29, 1924, less seven weeks' compensation previously paid, approving the contract between plaintiff and his attorney and condemning defendant to pay all costs. Defendant appealed.

### OPINION

The questions to be determined in this case are: Was plaintiff injured in the manner and to the extent claimed by him?

Plaintiff himself testified, page 2:

"Q. Now go ahead and explain the injury.
"A. Well, I was putting a jig on the machine to do some pipe fitting, and I had three negroes assisting me, and in putting it on the machine we got one side on the machine and had four on the same job; two were on the other side, and they turned loose to get on the other side and get in the center of the machine, and three turned loose, which left the weight of the jig to come on me, which was between four and five hundred pounds, and it had to either fall or I had to hold it, so I held it.

(Page 3)

"Q. Well, what did that do?
"A. It hurt my back.
"Q. Whereabouts in your back did it hurt you?
"A. What I call the small of the back.
"Q. It hurt the small of the back?
"A. Yes, sir.
"Q. What did you do after that?
"A. I worked on the rest of the day and the next day I stayed there and tried to work; thought I had to do so; and tried to work—tried to work till Saturday, or from that Saturday till the following Thursday. I could be mistaken about it one day but I don't think I worked but six days. I was off then for about a month, between three weeks and a month, then I went back and tried to work and worked four hours and since then I haven't done anything.
"Q. Since then you haven't done anything?
"A. No, sir.
"Q. Why not?
"A. I have not been able."

Doctor S. C. Barrow testified, page 10:

"Q. Did you make an examination of Mr. Thomas M. Million?
"A. Yes, sir.
"Q. Well, what did you find?
"A. I examined Mr. Million at the request of Dr. S. L. Williams on September 26th. This was an examination at that time as to the lower spine and his pelvis. The result of that examination was the report to Dr. Williams, and this examination shows a slight separation apparently in the sacro-iliac joint on the right, with a tilting of the fifth lumbar vertebrae to the left.

(Page 11)

"Q. Now, Doctor, you say you found two conditions existing there, two apparent conditions?
"A. Yes, sir. Well, yes, all in one, but ——
"Q. You spoke of them as two?
"A. Well, yes.
"Q. Well, what is the first?
"A. Well, there was a slight separation of the sacro-iliac joint on the right side

with some tilting of the fifth lumbar vertebrae to the left."

Doctor J. D. Young testified, page 13:

"Q. Dr. Young, you examined Mr. Million here yesterday?
"A. I did.
"Q. Please state what you found?
"A. I found a condition which, upon pressure, marked pressure, on the small of the back in the region of the third, fourth and fifth verterbrae, that you have muscular spasms, that is, violent contractions, patient complaining of pain, and slight difference in the reflexes of the right and left leg; the reflexes of the left leg were not as active as the right. Upon marked pressure over the hip bone seemed to produce and did produce muscular spasms, that is, of the muscles of the limb; that pain was complained of by the patient. From an examination I made I diagnosed that there was some mathology due to pressure upon the conde acuna, in other words the horse's tail, called horse's tail, that is near the end of the cord, where the nerve makes its exit, and a lesion in this area would give you the type of reaction that he was suffering from.
"Q. Doctor, did you have the advantage of an X-ray report?
"A. Not until I got through with my examination; got a statement from Dr. Barrow, got a report.
"Q. Was that report verified by what you found?
"A. My findings agreed with the X-ray report.

(Page 14)

"Q. Doctor, what have you to say as to the permanency of this injury?
"A. That depends altogether upon the treatment that surrounds this patient; if he was operated upon and there was a fusion, I would say that the condition that I find would correct itself in a few months; then again the condition might, or would improve, provided the patient is put to complete rest, in eight months to a year.

(Page 15)

"Q. Doctor, the operation, an operation around the spine is involved, is hazardous to life?
"A. There is always the possibility of infection which would cause neuritis, which would be rather dangerous."

Doctor Thomas Ragon, called on behalf of defendant, testified, page 22:

"Q. What examination did you make?
"A. I examined him where he complained, down in the back and several places around the body.
"Q. What did you find?
"A. Well, he flinches, as Dr. Young has spoken of, when there was pressure on the tail bone.
"Q. Would a normal person feel pain?
"A. I do not think a normal person would. I did not doubt but that he had pain there.

(Page 23)

"Q. You thought that he had pain there?
"A. I thought he had.
"Q. Did you connect that pain with anything revealed by the X-ray?
"A. I would not necessarily say at all, I think not; the X-ray man that took the picture showed the man was normal.
"Q. Did you examine the reflexes?
"A. I did.
"Q. What condition did you find as to those?
"A. I thought that there was a little difference in the reflexes, neither one up to par.

* * * *

"Q. From your examination of the plaintiff here, do you think that condition is due, this diminished reflex is due to any injury back there?
"A. Well, it would be rather hard to say, because I do not think that the reflexes were due to injury; I thought the injury rather increased the reflexes than otherwise.

(Page 26)

"Q. You think that Mr. Million can throw his stick away and do some work at this time?
"A. Well, I would not advise that; I would like to examine him more carefully before advising to do that, if he were my patient.
"Q. Would you give him some treatment?
"A. I think that I would.
"Q. The conditions existing there would yield to treatment?
"A. I think so.
"Q. What treatment would you give?
"A. Well, I think that he ought to have heat and massage, and perhaps internal

treatment, maybe a number of things, gradual exercise; with a careful examination I think that I could give treatment that would be helpful to him.

"Q. You don't think that it would be necessary to perform an operation on him?

"A. I don't think so at all.

(Page 27)

"Q. Doctor, what conditions did you find to exist there that required treatment, did not see anything from the X-ray?

"A. Well, the back, the muscles along there are short muscles, and if those were strained there ought to be a certain amount of rest, even some support, some light plastic jacket covering that part, and in addition some local treatment.

"Q. In other, words, you would treat him for muscular troubles?

"A. Yes, sir, muscular and tendon troubles."

Doctor J. E. Slicer, called for defendant, testified, page 39:

"Q. That is the point I am making. You have not seen that report since testifying about this case and you do not remember then what was shown?

"A. The thing that I remember is that there was some slight deviation of the bones from normal. It was of not enough consequence in my opinion to account for his trouble.

(Page 40)

"Q. All right. Now, Doctor, the prostrate there is more or less inflamed, isn't it?

"A. Very much inflamed.

"Q. In an injury from lifting, would that affect the prostate?

"A. It could aggravate the injury that already existed.

"Q. Could an injury to the fifth lumbar account for having lighted up the prostate?

"A. Probably an injury to the sacro-iliac joint could.

"Q. Also account for having lighted up the prostate, could it?

"A. Yes, sir."

The evidence in the record convinces us that the plaintiff was injured as he says he was, and according due weight to the testimony of the eminent physicians who testified in the case we are also convinced that the injury sustained by plaintiff, either as a direct cause or by aggravating a malady that lay dormant in him prior to the injury, has produced total disability to do work of any reasonable character that may continue for a short time or possibly indefinitely.

Plaintiff has asked for damages as for frivolous appeal; but in view of the fact that eminent physicians disagreed in their diagnoses as to the cause of plaintiff's condition and the probable duration thereof, there is reason to believe that defendant prosecuted its appeal in good faith, and therefore plaintiff's demand on this score must be denied.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment appealed from be affirmed.

———

ON APPLICATION FOR REHEARING

CARVER, J. Defendant's counsel urge that we erred in basing our decision partly on the conclusion that by reason of an accident in the course of plaintiff's employment a dormant malady was aggravated.

It is true that the decision states:

"We are also convinced that the injury sustained by plaintiff either as a direct cause or by aggravating a malady which lay dormant in him prior to the injury has produced total disability," etc.

It was perhaps not exactly correct to say that the prostatic trouble which Doctor Slicer found had lain dormant.

In our opinion, though, the gist of the matter is not the dormancy of the disease but the aggravation of it.

It is true that in the case of Behan vs. Honor, 143 La. 348; 78 South, 589, the disease stirred to activity had lain dormant, but we do not understand the court in that case to have said or implied

that it was only dormant diseases that would fall under the compensation act if aggravated by an accident arising out of and in the course of the employment.

In Craft vs. Gulf Lumber Co., 151 La. 281; 91 South 736, a hernia was found by the court to be in process of development and an accident quickening and accelerating it was held to be compensable.

In "Workmen's Compensation Acts," a Corpus Juris Treatise by Donald J. Kiser, published by the American Law Book Company and designed to form a part of Corpus Juris, the rule is laid down on page 69 as follows:

"Acceleration of a diseased bodily condition may constitute a personal injury, and an injury may be by accident, although it would not have been sustained by a perfectly healthy individual."

Various decisions are cited in support of the text, amongst which are some where the disease accelerated was heart disease, a skin disease, arterio schlerosis, and alcoholism.

It seems to us that an accident arising out of and in the course of employment which aggravates an active disease to the extent of causing disability in one previously able to do hard work, is compensable as well as one which stirs to activity a disease previously dormant.

Besides this, though, we are satisfied from the testimony of the physicians quoted in our original opinion that the plaintiff's injury is not confined to the prostate gland but that his condition is due in part at least to the separation of the sacro-iliac joint and the tilting of the fifth lumbar vertebra disclosed by the X-ray.

Rehearing refused.